J-A25039-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| AKEEM KEVIN WASHINGTON | : | |
| | : | |
| Appellant | : | No. 1655 MDA 2019 |

Appeal from the PCRA Order Entered September 11, 2019
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0000862-2015

BEFORE: BOWES, J., OLSON, J., and KING, J.

MEMORANDUM BY OLSON, J.:                    **FILED MARCH 23, 2021**

Appellant, Akeem Kevin Washington, appeals from the order entered on September 11, 2019, which denied his petition filed under the Post-Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546. We affirm.

This Court previously summarized the facts underlying Appellant's convictions:

> On December 28, 2014, Lancaster City Police Officers Gregory Berry and Erik Pannone were on patrol when their attention was drawn to a commotion in the parking lot of Yorgos Restaurant, Lancaster, and they observed the doorman, James King, point to an unidentified man and signal for aid. Officer Berry approached the unknown male while Officer Pannone asked for identification from Appellant, who refused that request in a profane manner. Officer Pannone then requested that Appellant remove his right hand from his pocket, and Appellant, again using vulgar language, ignored that demand. Officer Berry overheard Appellant's remarks and reiterated the command to Appellant to take his hand from his pocket. Appellant swore at Officer Berry and said that he would not comply with that directive.

After Officer Berry grabbed Appellant's right wrist in order to extricate his hand from the pocket, Appellant began to struggle with him. Officer Pannone deployed his taser, which did not affect Appellant. Appellant charged at Officer Berry who employed a strike to the neck designed to stun a person and swept Appellant's legs out from under his body. Appellant was arrested, but continued using expletives and resisting the police.

Due to Appellant's size, Sergeant Philip Berkheiser had been called to assist his fellow officers and met Officers Berry and Pannone in the police station's garage. Sergeant Berkheiser recognized Appellant from a previous arrest. He informed the other two officers to be careful as Appellant had previously harmed his girlfriend, nearly killing her. Appellant then threatened the sergeant. After Appellant was placed in a holding cell at the police station, he again made an intimidating remark to Sergeant Berkheiser. A separate criminal action was filed against Appellant charging him with offenses arising from his interaction with the three police officers at the parking lot and police station.

The offenses at issue in this [] case occurred after Appellant was processed at the police station and remanded to the Lancaster County [Prison]. Records from the prison established that Appellant was placed in the same cell as inmate [Tremayne] Jones, who confirmed that fact at trial. The two men had a number of conversations on December 28, 2015, and December 29, 2015. Appellant was angry about the "way he was arrested, how he was arrested." Specifically, Appellant was upset about being tasered and falling on the ground after Officer Berry swept his feet out from under him. Appellant also accused the officers of brutality and decided to exact revenge by killing Officer Pannone, Officer Berry, Sergeant Berkheiser, and Sergeant Berkheiser's family.

Due to the alarming and continuing nature of Appellant's threats against the three officers, on December 29, 2015, Mr. Jones went to prison authorities. He gave two executed statements to police, one on December 29, 2015 and the other one on December 31, 2015. Those written and adopted statements by Mr. Jones specifically delineated Appellant's

statements to Mr. Jones while they were in the cell together.[fn.1]

> [fn.1] At trial, Mr. Jones was unable to remember what he told police; consequently his two statements were introduced as substantive evidence. Appellant made no objection to the admission of these statements. Even though he could not recall what he told police, Mr. Jones repeatedly avowed that he would have been truthful with them. Additionally, Mr. Jones did remember that Appellant "threatened to kill three police officers. I definitely recall that."

On December 29, 2015, Mr. Jones approached Correctional Officer ("CO") Matthew Bodley and "said he had a problem and he said that what should he do if his cell mate was trying to get him to kill a bunch of cops." CO Bodley took Mr. Jones to an interview room and obtained the December 29, 2015 executed statement. Lancaster County Detective Thomas Ginder took Mr. Jones' second statement on December 31, 2015.

Mr. Jones told CO Bodley that Appellant said the following to Mr. Jones. Appellant had an incident with police at Yorgos Restaurant after he was refused entry into that establishment. Appellant said he was punched, kicked, and tased by Officers Berry and Pannone. Appellant then stated "that he was going to kill both officers when he got out and he wanted [Mr. Jones] to help him." Appellant instructed Mr. Jones to "make an anonymous call to lure the two officers" to an isolated area and then Appellant "would 'chop the car up,' meaning shooting it with a high-powered automatic rifle in the streets."

Appellant also planned to kill Sergeant Berkheiser. Appellant reported that he told "the sergeant, he was going to f_____ him up," which was consistent with Sergeant Berkheiser's testimony. Appellant explained that "he could wait for the sergeant to get off and follow him home and nobody would ever know," and that "he has multiple gun charges on his record." Appellant also informed Mr. Jones that he had access to two automatic rifles.

- 3 -

Mr. Jones reported to CO Bodley that he believed that Appellant would and was "very capable of doing it," *i.e.*, murdering the police. Mr. Jones concluded that Appellant was not "just venting because he spoke about [killing the three officers] multiple times during the course of two days." Appellant enlisted Mr. Jones' help in his plan because he knew that Mr. Jones was not from Pennsylvania and "no one would even know" Mr. Jones.

Mr. Jones' December 31, 2015 statement was similar in nature. Mr. Jones informed Detective Ginder that, when Appellant arrived in the cell on December 28, 2015, he was "aggressive, hostile, angry, [and] bitter" because police had physically abused him. Mr. Jones gave Detective Ginder a detailed statement made to him by Appellant about the events at Yorgos Restaurant and the police station, and Mr. Jones's version matched those offered by the three officers at trial.

Mr. Jones then launched into a description about Appellant's scheme to kill the officers in question. Appellant had two separate plots, one involved Officers Berry and Pannone while the other one pertained to Sergeant Berkheiser. Regarding Officers Berry and Pannone, Appellant planned to have Mr. Jones place an anonymous call to the police station to "lure them to a dark area," when Appellant would "jump out and chop their car up." Mr. Jones also clarified to Detective Ginder that "chop their car up" was street jargon and meant "use a high-powered rifle to shoot into their vehicle." Appellant explained that he could get Officers Berry and Pannone to enter an isolated area "where he knows they would be working that time of night." Appellant indicated that he would be able to lure the officers to the desired location where he would be waiting because he was from Lancaster and "there are only a few specific cops that work that beat at that time of night and he has seen those officers a few different times."

Appellant's scheme to kill Sergeant Berkheiser was different. Appellant wanted to follow "the sergeant home and shoot him in his driveway. And if his family came out, he was going to shoot them, too." Appellant enlisted Mr. Jones' aid in the plot to kill the sergeant. Mr. Jones was supposed to ride in the car with Appellant so Mr. Jones could operate as a lookout. Appellant told Mr. Jones that Appellant could access two

assault rifles from his cousin and obtain two other guns from his wife's home.

Appellant additionally felt that any charges arising from the incident at Yorgos Restaurant would be quickly resolved in his favor. He anticipated conducting the two attacks one week after he was released, and asked Mr. Jones to exchange telephone numbers with him. Since Appellant did not expect to be out of jail until January 9, 2016, while Mr. Jones would be released earlier, Appellant told Mr. Jones to "stay at [Appellant's] house until they were able to do this, and then [Appellant] would hook him up with heroin to sell to get money, basically as payment for this act." Appellant believed that he would be able to avoid apprehension since he knew Lancaster so well.

Mr. Jones told Detective Ginder that, while they were in the cell together, Appellant never stopped talking about the plans to kill the three police officers. Thus, over a two-day period, Appellant plotted his crimes day and night. Mr. Jones stated, "We never discussed women, never discussed clothes, places to eat. Our conversation was just about executing these officers." Mr. Jones also reported that Appellant "is very competent. He knew what he was saying. He understood what needed to be done, how it needed to be done. His planning was thorough. It's crazy. He is intelligent."

While Mr. Jones had heard other inmates threaten police, he did not take those statements seriously, but Mr. Jones believed that Appellant was resolute about his plot. Appellant took pride in his calculations and "was smiling. We talked a lot about it. He was very adamant about doing it. He thought the plan to follow the sergeant was a smart plan." Mr. Jones came forward to police due to the credibility of Appellant's threats and his discomfort with including Sergeant Berkheiser's family among the proposed victims.

Police executed a warrant at the home of Appellant's wife and recovered a semi-automatic handgun. They were unable to search the home of any of Appellant's cousins since he had so many cousins in the area and Mr. Jones had not been given the name of the cousin with the assault rifles.

*Commonwealth v. Washington*, 159 A.3d 1002 (Pa. Super. 2016) (unpublished memorandum) at 1-8 (citations and some corrections omitted).

Following a jury trial, Appellant was found guilty of three counts of solicitation to commit murder. On October 30, 2015, the trial court sentenced Appellant to serve an aggregate term of 25 ½ to 60 years in prison for his convictions. We affirmed Appellant's judgment of sentence on December 13, 2016; Appellant did not file a petition for allowance of appeal with the Pennsylvania Supreme Court. *See id.*

In November 2017, Appellant retained private counsel "to represent him in his motion for post-conviction collateral relief." Appellant's Motion for PCRA Relief, 3/19/18, at 2. However, due to PCRA counsel's error, counsel did not file a timely PCRA petition on Appellant's behalf. Instead, counsel filed Appellant's PCRA petition on March 19, 2018 – which was outside of the PCRA's one-year time-bar. *See* Appellant's First PCRA Petition, 3/19/18, at 1-5. Thus, on April 17, 2018, the PCRA court dismissed Appellant's first PCRA petition as untimely. PCRA Court Order, 4/17/18, at 1.

On May 11, 2018, Appellant filed a second PCRA petition, *pro se*. Within this petition, Appellant claimed that his PCRA counsel was ineffective for failing to file his first PCRA petition in a timely manner. *See* Appellant's *Pro Se* Second PCRA Petition, 5/11/18, at 1-2. Further, Appellant claimed that his second petition was timely under the PCRA, as his pleading satisfied the

requirements of 42 Pa.C.S.A. § 9545(b)(1)(ii).[1]   Specifically, Appellant claimed, counsel's untimely filing of his first PCRA petition constituted a "newly discovered fact," in accordance with Section 9545(b)(1)(ii). ***Id.*** at 2.

After receiving Appellant's *pro se* second PCRA petition, the PCRA court appointed counsel to represent Appellant during the proceedings. ***See*** PCRA Court Order, 5/16/18, at 1. Nevertheless, on May 23, 2018, Appellant retained private counsel and, on July 20, 2018, counsel filed an amended PCRA petition.

While Appellant's second PCRA petition was pending, the Pennsylvania Supreme Court decided ***Commonwealth v. Peterson***, 192 A.3d 1123 (Pa. 2018). The ***Peterson*** Court held that, when counsel files an untimely first PCRA petition, counsel is ineffective *per se*, as the untimely filing "completely deprive[s the petitioner] of any consideration of his collateral claims under the PCRA." ***Commonwealth v. Peterson***, 192 A.3d 1123, 1130 (Pa. 2018).

---

[1] 42 Pa.C.S.A. § 9545(b)(1)(ii) declares:

> (1) Any petition under [the PCRA], including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:
>
> . . .
>
> (ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence.

42 Pa.C.S.A. § 9545(b)(1)(ii).

Moreover, the **Peterson** Court held that counsel's ineffectiveness in connection with the untimely filing may constitute a "newly discovered fact" under Section 9545(b)(1)(ii), where the petitioner is able to plead and prove that he "did not know about the untimely filing and could not have ascertained this fact through the exercise of due diligence." **Id.** at 1130-1131.

On October 16, 2018, the PCRA court effectively held that Appellant's second PCRA petition was timely under Section 9545(b)(1)(ii) and **Peterson**. **See** PCRA Court Order, 10/16/18, at 1; **see also** PCRA Court Opinion, 9/11/19, at 7.

Within Appellant's second PCRA petition, Appellant raised a number of substantive claims. As is relevant to the current appeal, Appellant claimed that his trial counsel was ineffective because counsel: 1) "gave advice so unreasonable that it vitiated [Appellant's] knowing and intelligent decision to not testify in his own defense;" 2) failed to impeach the Commonwealth's main witness, Tremayne Jones, with certain matters that would have affected Mr. Jones' credibility; and, 3) failed to call his former-wife, Sasha Washington Rosado, and Lancaster County Prison Corrections Officer Miguel Albino as witnesses at trial. Appellant's Amended PCRA Petition, 7/20/18, at 3; Appellant's Second Amended PCRA Petition, 12/17/18, at 1-3.

On April 10, 2019, the PCRA court held a hearing on Appellant's petition and, on September 11, 2019, the PCRA court denied Appellant relief. Appellant filed a timely notice of appeal. He raises the following claims to this Court:

Whether the PCRA court erred in denying [Appellant] a new trial where:

a. Trial counsel's advice that [Appellant's] prior aggravated assault conviction would be admissible if he were to testify was so unreasonable that [Appellant] did not and could not have made a knowing and intelligent decision to not testify at trial[;]

b. Trial Counsel provided ineffective assistance of counsel when he failed to elicit from the primary Commonwealth witness prior statements that would have brought into question his credibility[.]

c. Trial counsel provided ineffective assistance of counsel when he failed to call two [witnesses] on [Appellant's] behalf at trial. The failure of which denied [Appellant] a fair trial as these witnesses would have severely undercut the [prosecution's] main arguments regarding [Appellant's] guilt.

Appellant's Brief at 4 (some capitalization omitted).

"Under the applicable standard of review, we must determine whether the ruling of the PCRA court is supported by the record and is free of legal error. The PCRA court's credibility determinations, when supported by the record, are binding on this Court." *Commonwealth v. Spotz*, 18 A.3d 244, 259 (Pa. 2011) (citations omitted). "However, this Court applies a *de novo* standard of review to the PCRA court's legal conclusions." *Id.*

To be eligible for relief under the PCRA, the petitioner must plead and prove by a preponderance of the evidence that his conviction or sentence resulted from "one or more" of the seven, specifically enumerated circumstances listed in 42 Pa.C.S.A. § 9543(a)(2). One of these statutorily enumerated circumstances is the "[i]neffective assistance of counsel which, in

the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S.A. § 9543(a)(2)(ii).

Counsel is presumed to be effective and "the burden of demonstrating ineffectiveness rests on [A]ppellant." **Commonwealth v. Rivera**, 10 A.3d 1276, 1279 (Pa. Super. 2010). To satisfy this burden, Appellant must plead and prove by a preponderance of the evidence that:

> (1) his underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his interests; and, (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the challenged proceedings would have been different.

**Commonwealth v. Fulton**, 830 A.2d 567, 572 (Pa. 2003). As this Court has explained:

> A claim has arguable merit where the factual averments, if accurate, could establish cause for relief. **See Commonwealth v. Jones**, 876 A.2d 380, 385 (Pa. 2005) ("if a petitioner raises allegations, which, even if accepted as true, do not establish the underlying claim . . . , he or she will have failed to establish the arguable merit prong related to the claim"). Whether the facts rise to the level of arguable merit is a legal determination.
>
> The test for deciding whether counsel had a reasonable basis for his action or inaction is whether no competent counsel would have chosen that action or inaction, or, the alternative, not chosen, offered a significantly greater potential chance of success. Counsel's decisions will be considered reasonable if they effectuated his client's interests. We do not employ a hindsight analysis in comparing trial counsel's actions with other efforts he may have taken.

- 10 -

Prejudice is established if there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

**Commonwealth v. Stewart**, 84 A.3d 701, 707 (Pa. Super. 2013) (some quotations and citations omitted). "A failure to satisfy any prong of the test for ineffectiveness will require rejection of the claim." **Id.**

First, Appellant claims that his trial counsel (hereinafter "Trial Counsel") was ineffective for advising Appellant not to testify at trial, where counsel reasoned that, if Appellant chose to testify, he would be impeached with his prior conviction for aggravated assault.

As our Supreme Court has held:

> The decision of whether or not to testify on one's own behalf is ultimately to be made by the defendant after full consultation with counsel. In order to sustain a claim that counsel was ineffective for failing to advise the appellant of his rights in this regard, the appellant must demonstrate either that counsel interfered with his right to testify, or that counsel gave specific advice so unreasonable as to vitiate a knowing and intelligent decision to testify on his own behalf.
>
> . . .
>
> The right of an accused to testify on his own behalf is a fundamental tenet of American jurisprudence and is explicitly guaranteed by Article I, Section 9 of the Pennsylvania Constitution. The decision to forgo such a significant right . . . can not be based on mistaken guidance.

**Commonwealth v. Nieves**, 746 A.2d 1102, 1104-1105 (Pa. 2000) (citations omitted).

Appellant and Trial Counsel testified at the PCRA hearing that, during trial, Appellant told Trial Counsel that he wanted to testify on his own behalf. However, Trial Counsel advised Appellant not to testify, as Appellant had been convicted of aggravated assault in connection with "a domestic incident." N.T. PCRA Hearing, 4/10/19, at 58, 64, and 117-120. Now on appeal, Appellant claims that Trial Counsel's advice was unreasonable and interfered with his decision not to testify on his own behalf, as the advice "was based upon an erroneous legal conclusion that [Appellant's] aggravated assault conviction was admissible at trial if [Appellant] testified." Appellant's Brief at 16 (some capitalization omitted). Specifically, Appellant claims that the aggravated assault conviction "was not for a crime of falsehood nor was it admissible for any other reason." *Id.* Appellant's claim on appeal fails.

We have explained:

> "For the purpose of attacking the credibility of any witness, evidence that the witness has been convicted of a crime, whether by verdict, or by plea of guilty or nolo contendere, shall be admitted if it involved dishonesty or false statement." Pa.R.E. 609(a). Crimes involving dishonesty or false statement are commonly referred to as *crimen falsi* crimes. *Crimen falsi* involves the element of falsehood, and includes everything which has a tendency to injuriously affect the administration of justice by the introduction of falsehood and fraud.
>
> When deciding whether a particular offense is *crimen falsi*, one must address both the elemental aspects of that offense **and** the conduct of the defendant which forms the basis of the anticipated impeachment. Accordingly, this Court employs a two-step procedure to determine whether a crime is *crimen falsi*. First, we examine the essential elements of the offense to determine if the crime is inherently *crimen falsi*

- 12 -

– whether dishonesty or false statement are a necessary prerequisite to commission of the crime. Second, if the crime is not inherently *crimen falsi*, this Court then inspects the underlying facts that led to the conviction to determine if dishonesty or false statement facilitated the commission of the crime.

***Commonwealth v. Davis***, 17 A.3d 390, 395-396 (Pa. Super. 2011) (corrections and some quotations and citations omitted) (emphasis in original).

Aggravated assault is not inherently *crimen falsi*. Thus, had Appellant testified at trial, his aggravated assault conviction would not have automatically been admissible as impeachment evidence. However, this does not end our inquiry, as the second step of the test requires that we "inspect[] the underlying facts that led to the conviction to determine if dishonesty or false statement facilitated the commission of the crime." ***Id.*** Further, with respect to this issue, it is important to note that Appellant is seeking relief under the PCRA, based upon a claim that Trial Counsel was ineffective. As such, Appellant bears the "burden of demonstrating ineffectiveness." ***Commonwealth v. Rivera***, 10 A.3d 1276, 1279 (Pa. Super. 2010). Stated another way, during the PCRA hearing, the Commonwealth did not have the burden of proving that "dishonesty or false statement facilitated the commission" of Appellant's prior aggravated assault conviction. ***See Davis***, 17 A.3d at 395-396. Rather, Appellant, as the PCRA petitioner, bore the burden of proving that he was entitled to post-conviction collateral relief and,

thus, Appellant bore the burden of proving that dishonesty or false statement **did not** facilitate his aggravated assault conviction.[2]

The record demonstrates that Appellant failed to meet his burden of production regarding the inadmissibility of the aggravated assault conviction. Specifically, the record contains no evidence regarding the circumstances of Appellant's aggravated assault conviction and at no time during the PCRA hearing did Trial Counsel, Appellant, or anyone else testify that the aggravated assault conviction was not accomplished by dishonesty or false statement. Further, during the PCRA hearing, Trial Counsel never admitted that he erred in giving his specific advice to Appellant; instead, regarding this issue, Trial Counsel merely responded to hypotheticals that were proffered by Appellant's PCRA counsel.[3]  Moreover, the Commonwealth never stipulated or expressly

---

[2] At trial, "[t]he burden . . . is upon the party offering the conviction during cross-examination" to prove that the conviction qualifies as *crimen falsi*. **Davis**, 17 A.3d at 396.  Thus, at the PCRA stage, it is more accurate to state that Appellant has the burden of pleading and proving that the Commonwealth would not have been able to prove that the aggravated assault conviction qualifies as *crimen falsi*.  For simplicity, however, we have declared that Appellant "bore the burden of proving that dishonesty or false statement did not facilitate his aggravated assault conviction." **See supra** at *14 (emphasis omitted).

[3] During the PCRA hearing, Trial Counsel testified:

> Q: **Hypothetical**.  As an attorney who has been practicing as long as you were at the time, **if** that [advice were] incorrect, that the aggravated assault conviction would be put in front of the jury and that any details of that would be put in front of the jury, **if those two things were incorrect**, would your advice to [Appellant] have been different about him testifying or not testifying?

admitted to the aggravated assault conviction being inadmissible as impeachment evidence,[4] and the PCRA court did not make any specific factual

_____

. . .

A: It's hard to armchair quarterback later, even from my own perspective, but I will say since my recollection of the conversation, the short answer would be, I think – I would say yes. And if I can qualify that?

Q: Of course.

A: Simply because it's my reasoning, which I know it was because I told him and I remember telling his family was, I don't want them to hear about your violence. I don't want them to hear about your violence.

**If that [were] incorrect**, then there would have been no reason to advise him otherwise, specifically. And he told me, no, I really want to get up there to explain to the jury how he got that.

Does that answer your question?

Q: Yes.

***See*** N.T. PCRA Hearing, 4/10/19, at 65-66 (emphasis added).

_____

[4] In the Commonwealth's brief on appeal, the Commonwealth acknowledges that "an [a]ggravated [a]ssault conviction would not be admitted as a matter of course." Commonwealth's Brief at 11. This is a correct recitation of the law, as everyone agrees that aggravated assault is not inherently *crimen falsi* and, thus, is not automatically admissible as impeachment evidence. However, the Commonwealth's brief does not discuss the second-step of the admissibility test: whether "the underlying facts that led to the conviction [reveal that] dishonesty or false statement facilitated the commission of the crime." ***See Davis***, 17 A.3d at 396. Nevertheless, the Commonwealth is the appellee in this case and, as such, does "not bear the burden of issue preservation." ***Heim v. MCARE Fund***, 23 A.3d 506, 511 (Pa. 2011); ***see also See Commonwealth v. Moore***, 937 A.2d 1062, 1073 (Pa. 2007) ("an

- 15 -

findings on this point. ***See*** PCRA Hearing, 4/10/19, at 1-134; Commonwealth's Answer to Petitioner's Brief in Support of Amended Post-Conviction Collateral Relief, 8/5/19, at 3-8; Commonwealth's Brief at 1-14; PCRA Court Opinion, 9/11/19, at 1-29.

Therefore, we conclude that Appellant's ineffective assistance of counsel claim fails, as Appellant did not satisfy his burden of production to demonstrate that his underlying claim has arguable merit.

Next, Appellant claims that Trial Counsel was ineffective for failing to properly cross-examine the Commonwealth's main witness, Tremayne Jones. Specifically, Appellant contends that Trial Counsel should have impeached Mr. Jones with the following false statements: 1) in February 2015, Mr. Jones pleaded guilty to criminal charges and, on his guilty plea colloquy, Mr. Jones falsely stated that he did not have a mental health history and 2) during cross-examination in Appellant's case, Mr. Jones "stated that he thought his [own attorney] was 'awesome' . . . [, however,] in numerous phone calls recorded from [prison,] Mr. Jones continually denigrated his attorney." Appellant's Brief at 19-20.

During trial, Trial Counsel extensively cross-examined Mr. Jones regarding: the possibility that Mr. Jones suffered from schizophrenia; the possibility that Mr. Jones was having hallucinations and "hearing things"; the

---

appellate court may affirm a valid judgment based on any reason appearing as of record, regardless of whether it is raised by the appellee").

- 16 -

fact that, at the time of trial, Mr. Jones was taking the anti-psychotic medication Seroquel; the fact that Mr. Jones suffered from bipolar disorder and was taking Lithium; the possibility that, prior to arriving in Lancaster, Mr. Jones was hospitalized in a psychiatric institution in Houston, Texas; the fact that, when Mr. Jones was younger, he was hit in the head with an axe and, because of this, Mr. Jones suffered numerous seizures; the possibility that Mr. Jones has "a serious past history of alcohol and drug abuse;" the possibility that Mr. Jones was arrested for possessing a controlled substance in both Tennessee and Texas; the possibility that Mr. Jones is "a pimp;" the possibility that Mr. Jones had been arrested in Washington State for promoting prostitution and trafficking; the fact that, in 2009, Mr. Jones pleaded guilty to receiving stolen property; the fact that, when Mr. Jones and Appellant were in jail together, Mr. Jones had been arrested for terroristic threats and disorderly conduct; the possibility that Mr. Jones might have lied about everything in Appellant's case in order to secure an early release from jail; the possibility that Mr. Jones might "have problems remembering things accurately"; the possibility that Mr. Jones might have received a lenient sentence for informing upon Appellant; and, the possibility that Mr. Jones only spoke up in Appellant's case because a witness overheard Mr. Jones and Appellant talking and, afterwards, prison officials threatened Mr. Jones with being an accomplice to the crimes.  N.T. Trial, 8/10/15, at 141-196.

On appeal, Appellant claims that Trial Counsel was ineffective for failing to cross-examine Mr. Jones on two additional matters:  the possibility that, in

February 2015, Mr. Jones falsely stated he did not have a mental health history and the possibility that Mr. Jones did not actually think his attorney was "awesome." Appellant's Brief at 19. Simply stated, even if Trial Counsel could be considered ineffective for failing to cross-examine Mr. Jones on these two additional issues, Appellant's claim on appeal fails because Appellant was not prejudiced by Trial Counsel's inaction. Indeed, both of Appellant's claims involve minor, collateral matters that would have had a *de minimis* impact upon Mr. Jones' credibility. Given Trial Counsel's extensive cross-examination of Mr. Jones, where he thoroughly attacked Mr. Jones' credibility, we conclude that, even if Trial Counsel would have cross-examined Mr. Jones on the two additional matters, there is no "reasonable probability that . . . the result of the proceeding would have been different." **Stewart**, 84 A.3d at 707. As such, Appellant's claim on appeal fails.

Finally, Appellant claims that Trial Counsel was ineffective for failing to call two witnesses on Appellant's behalf.

Our Supreme Court has explained:

> In order to prevail on a claim of ineffectiveness for failing to call a witness, a [petitioner] must [plead and] prove, in addition to ... the three [general ineffective assistance of counsel] requirements [listed above], that: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew or should have known of the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the witness's testimony was so prejudicial as to have denied [the petitioner] a fair trial.

*Commonwealth v. Wright*, 961 A.2d 119, 155 (Pa. 2008). "[T]rial counsel will not be found ineffective for failing to call a witness whose testimony would be cumulative." *Commonwealth v. Gibson*, 951 A.2d 1110, 1134 (Pa. 2008); *see also Commonwealth v. Milligan*, 693 A.2d 1313, 1319 (Pa. Super. 1997) ("[a]s a general rule, counsel will not be deemed ineffective for failing to call witnesses whose testimony is merely cumulative of that of other witnesses").

According to Appellant, Trial Counsel was ineffective for failing to call his then-wife, Sasha Washington Rosado, and Lancaster County Prison Corrections Officer Miguel Albino as witnesses during trial. The trial court ably explained why Appellant's claim fails:

> [Mr. Jones] testified at trial that [Appellant] told him part of [Appellant's] plan was to have his then-wife, Sasha Washington Rosado, make a 911 call to get the police to come to the house so [Appellant] would have the opportunity to shoot the police. [Trial Counsel] noted the ridiculousness of this story in his opening remarks because [Appellant's] wife was hearing impaired and could not make a 911 call. [Trial] Counsel failed, however, to call [Appellant's] wife as a witness to testify to her hearing impairment, and could offer no reason for having failed to do so.
>
> [Appellant's] ex-wife testified for [Appellant] at the PCRA Hearing. She stated that she is hearing impaired and requires the assistance of a sign language interpreter. Ms. Rosado testified that at the time of [Appellant's] trial she was ready and willing to testify on behalf of her then-husband but she would have required the services of an interpreter.
>
> Ms. Rosado explained that she has a video phone that connects to her TV. She uses an interpreting service that is available 24-hours, 7-days-a-week. After placing the call, Ms. Rosado waits approximately one to two minutes for an

- 19 -

interpreter to appear on her TV screen. The interpreter then makes the call for her and signs the conversation for Ms. Rosado. Ms. Rosado testified that she has previously made a 911 call.

On cross examination, Ms. Rosado explained that she is able to make a 911 call without waiting the one to two minutes for an interpreter to appear on her TV. She stated that if she makes a 911 call with her interpreting service, an interpreter immediately appears without any wait. She did note that the interpreter service does not allow her to be anonymous, as her name and address are registered with the service.

Thus, [Trial Counsel's] statement to the jury in his opening argument that Ms. Rosado was incapable of making a 911 call was incorrect, and had Ms. Rosado been called to testify, the jury would have learned that [Appellant's] plan to have his wife make the 911 call to summon the police to the house so [Appellant] would have the opportunity to shoot them was quite possible. Simply because the 911 call could not have been made anonymously and the police would have known Ms. Rosado's name and address from the interpreter service does not suggest the police would not have responded to an alleged emergency. This claim therefore lacks merit.

[Appellant] claims the testimony of [Lancaster County Prison] Corrections Officer Albino would have eliminated the Commonwealth's argument that [Mr.] Jones could only have known the particulars of [Appellant's] case if [Appellant] had told him. At the PCRA Hearing, Corrections Officer Albino generally explained the intake procedure at [Lancaster County Prison] in December [] 2014, including the prisoner's preliminary arraignment in front of a magisterial district judge at which time the prisoner receives a copy of the criminal complaint and affidavit of probable cause. Officer Albino further generally explained the prisoner's assignment to a cellblock and cell. He testified, however, that he had no specific recollection of having any direct contact with either [Appellant] or [Mr.] Jones, and acknowledged that he never saw [Appellant's] criminal complaint being printed out at [Lancaster County Prison], never saw [Appellant's] criminal complaint being provided to [Appellant], and never saw [Appellant's] criminal complaint before the PCRA Hearing. The corrections officer acknowledged that had he been called

- 20 -

to testify at trial in 2015, his answers would have been the same.

[Appellant] argues that such testimony would have explained how [Mr.] Jones was aware of the circumstances of [Appellant's] arrest and the names of the police officers involved in the arrest. [Trial Counsel] testified at the PCRA Hearing that this information would have been helpful to explain how [Mr.] Jones knew particular information regarding [Appellant's] case but that he had no reason for failing to call this witness at trial.  In fact, this proffered testimony would have been duplicative of the testimony provided at trial by Matthew K. Bosley, another corrections officer at [Lancaster County Prison].

Corrections Officer Bosley was questioned generally by [Trial Counsel] regarding prisoners' legal paperwork. [Trial Counsel] asked Corrections Officer Bosley whether prisoners entering [Lancaster County Prison] "typically have their paperwork from their attorneys, like their affidavits of probable cause," to which the witness answered, "[m]ost likely." [Trial Counsel] followed up by asking if the prisoners then get to keep their legal papers in their cell.  Corrections Officer Bosley answered, "[y]es, they can keep every legal work they have." Corrections Officer Albino's PCRA testimony was nearly identical to that of Corrections Officer Bosley's trial testimony. [Trial Counsel] will not be deemed ineffective for failing to call a witness whose testimony would have served no added purpose and would have been merely cumulative of that of another witness.

Trial Court Opinion, 9/11/19, at 20-23 (citations omitted).

We agree with the trial court's cogent analysis and conclude that Appellant's final claim on appeal thus fails.

Order affirmed.  Jurisdiction relinquished.

Judge Bowes joins.

Judge King files a Dissenting Memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/23/2021